UNITED

STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY DAWAYNE HINES,

        Plaintiff,

    v.

NANCY A. BERRYHILL,

        Defendant.

Case No. 16-cv-03078-JSC

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 13, 18

      Plaintiff Anthony Dawayne Hines ("Plaintiff") seeks social security benefits for a combination of physical and mental impairments, including severe hip pain and depression. Plaintiff brings this action pursuant to 42 U.S.C. Section 405(g), seeking judicial review of a final decision by Defendant Nancy Berryhill, the Acting Commissioner of the Social Security Administration, denying Plaintiff's application for disability benefits.[1] Now pending before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment.[2] (Dkt. Nos. 13, 18.) Although the Court affirms much of the ALJ's decision, because the ALJ failed to consider Plaintiff's use of cane and such failure was not harmless as a matter of law, the Court GRANTS Plaintiff's Motion for Summary Judgment in part and DENIES Defendant's Cross-Motion for Summary Judgment.

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is therefore substituted for Carolyn W. Colvin as the Defendant in this action. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).
[2] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 3 & 9.)

**LEGAL STANDARD**

A claimant is considered "disabled" under the Social Security Act if he or she meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that she is unable to do her previous work and cannot, based on his age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

**PROCEDURAL BACKGROUND**

On October 4, 2011, Plaintiff filed an application for Social Security Disability benefits, both Title II and Title XVI. (Administrative Record ("AR") 280-290.) The Social Security Administration ("SSA") denied the application in an undated notice. (AR 137.) Plaintiff filed a Request for Reconsideration which was denied on January 18, 2013. (AR 146.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 153.) The first hearing was held on November 13, 2013 and a second hearing was held on July 9, 2014. (AR 30, 59.) On August 5, 2014, the ALJ issued a written decision denying Plaintiff's application. (AR 8.) Plaintiff filed a request for review, which the Appeals Council denied on April 13, 2016. (AR 1.) On June 6, 2016, Plaintiff initiated this action, seeking judicial review of the SSA's disability

determination under 42 U.S.C. Section 405(g). (Dkt. No. 1.) The parties' cross-motions for summary judgment are now pending before the Court. (Dkt. Nos. 13, 18 & 19.)

### FACTUAL BACKGROUND

Plaintiff was born on February 14, 1966. (AR 66.) He is a veteran. (AR 409.) He worked for the United States Postal Service from 1992 until 2004, and then did part-time landscaping work from 2004 until 2008. (AR 347.) Since June 1, 2008, Plaintiff has not had "substantial gainful" employment. (AR 13.) He has mild degenerative disc disease of the lumbar spine; bilateral osteoarthritis of the hips; degenerative joint disease of the right foot; obesity; a depressive disorder; an antisocial personality disorder; substance-induced psychosis; and polysubstance abuse. (AR 13.)

## I. MEDICAL EVALUATIONS AND HISTORY

At the time of Plaintiff's disability onset date in 2008 he was incarcerated at California State Prison Solano for strong-arm robbery. (AR 423-459, 595.) He saw various medical providers while there and following his release. A discussion of the relevant medical evidence follows.

### A. **Medical History**

Plaintiff alleges that his disability began with left hip joint pain and depression on June 1, 2008. (AR 66, 70.) On September 1, 2009, Plaintiff was diagnosed with Schizoaffective Disorder with depression, periodic suicidal ideation, and auditory hallucinations. (AR 426-427.)

In 2010, physicians continued to diagnose Plaintiff with Schizoaffective Disorder and prescribed him medication accordingly. (AR 446, 460.) On March 7, 2011, a psychiatrist noted that Plaintiff was responding to his medication and was neither suicidal nor homicidal, but was experiencing some paranoia. (AR 444.) Two months later, a clinician reported that Plaintiff was "mostly stable . . . possibly due to prescribed medications" and that his major depressive order was recurrent, but in remission. (AR 443.) However, Plaintiff indicated that he still had mild paranoid ideation. (*Id.*)

In July 2010, Plaintiff reported to Dr. John Casey that he could not walk without pain and x-rays showed that he had severe avascular necrosis of the left hip with total joint collapse. (AR

3

440.) Dr. Casey recommended that Plaintiff lose weight, take pain medication, and eventually have a hip replacement. (*Id.*) In July 2011, while in prison, Plaintiff was prescribed a wooden cane and a special vest to indicate to others that he is mobility impaired, which is referred to as a "mobility impaired vest." (AR 439, 479.) A month later, a mental health clinician noted that Plaintiff was using a cane. (AR 469.) A year later, Plaintiff was diagnosed with severe left and moderate right hip osteoarthritis. (AR 589.) He was still using his cane in 2012 and 2013. (AR 557, 634, 827.)

On January 9, 2012, while on parole, Plaintiff complained that he was having suicidal thoughts, so he was sent to a psychiatric hospital via a 5150 involuntary hold. (AR 411.) At the hospital, Plaintiff reported that he was having command hallucinations to kill himself and he had a rash all over his body. (AR 537.) The following day, he was further assessed and found to have a recurrent major depressive disorder with a severe psychotic feature and the doctor rated his Global Assessment of Functioning Scale ("GAF") score at 35.[3] (AR 538.) Plaintiff appeared withdrawn, anxious, and had some underlying psychomotor retardation, but was polite and able to follow directions. (*Id.*) Plaintiff was discharged that same day because he told doctors that he never actually had a plan to kill himself and he was found to no longer be depressed, suicidal, or to be hearing voices, though he still felt dysphoric. (AR 539.) Additionally, while Plaintiff was at the hospital, he was limping because of his hip problem, but there was no acute distress and he indicated that he preferred to stand. (*Id.*)

The next month, Plaintiff was incarcerated for 25 days for violating his parole by using cocaine. (AR 595.) Approximately two months later, during an examination with Dr. Lee, a psychiatrist, Plaintiff indicated a depressed mood, but thanks to his medications he had no

---

[3] A Global Assessment of Functioning Scale score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment. *Brewes v. Comm'r of Soc. Sec.*, 682 F.3d 1157, 1165 n.1 (9th Cir. 2012). The score ranges from zero to 100, and serves as a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. *See Sigmon v. Kernan*, No. 06-5807-AHM(JWJ), 2009 WL 1514700, at *9 n.3 (C.D. Cal. May 27, 2009). "A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social occupational, or school functioning (e.g., no friends, unable to keep a job)." *Quiana La Nay Chase v. Colvin*, No. 13-1816-KAW, 2014 WL 4544096, at *10 (N.D. Cal. Sept. 12, 2014) (internal citation and quotation marks omitted).

psychotic symptoms or suicidal thoughts.  (AR 597.)  Plaintiff also indicated suffering from chronic moderate-severe hip pain.  (*Id*.)  Dr. Lee rated Plaintiff's GAF score at 55.  (*Id*.)

In June 2012, Plaintiff ran out of medication and started feeling paranoid and having auditory hallucinations again (at this time, a psychiatrist renewed his medication.)  (AR 408.)  That month, Plaintiff had x-rays of his pelvis, hips, and spine lumbosacral.  (AR 665-668.)  The x-rays showed that Plaintiff has mild L5-S1 degenerative disc disease, anterior subluxation of S1 on S2, severe left and moderate right hip osteoarthritis, and osteophyte formation and subchondral cysts.  (*Id*.)

The next month, Plaintiff saw a nurse practitioner and indicated that he was depressed, but the nurse practitioner reported that he had no mental health condition that required further intervention.  (AR 594.)  Plaintiff also had an x-ray to evaluate his bilateral hip pain which found that he had severe left and moderate right hip osteoarthritis.  (AR 666.)  In September 2012, he had a CT of the lumbar spine which found moderate degenerative disc disease at L5-S1 with moderate left neural foraminal narrowing.  (AR 664.)

Plaintiff was still hearing voices in March 2013, but was attending Laney College to receive a welding certificate.  (AR 631.)  Dr. James, a psychiatrist, reported that Plaintiff appeared upbeat about getting back into the job market.  (*Id*.)  However, a few months later, Plaintiff indicated feeling very limited by his hip and back pain—he had significant pain when standing after sitting or lying down—so the doctor encouraged him to continue physical therapy.  (AR 860-861.)

Six months later, Plaintiff's psychiatric condition was generally stable and his response to treatment was fair.  (AR 629.)  Plaintiff was assigned a GAF score of 45.  (*Id*.)  Plaintiff was still depressed in May 2014 and also reported being irritable, though he was 46 days clean.  (AR 761.)  He still suffered from hip pain.  (*Id*.)  The next month, he was seen by Dr. Sylvana Reisland and again diagnosed with Schizoaffective Disorder Depressive Type, but he felt his condition was stable and he did not need an adjustment to his medication.  (AR 393.)  Two days later, however, he was seen by Dr. Howard and reported hearing voices every other day and felt angry and

United States District Court
Northern District of California

1   paranoid around people.  (AR 724.)  Dr. Howard diagnosed him with psychotic disorder NOS.

2   (*Id.*)

3          At that same time, Plaintiff was suffering from right shoulder pain, which was eventually

4   diagnosed in June 2014 with x-rays and found to be because of moderate to severe degenerative

5   changes of the glenohumeral joint.  (AR 652.)  He also had bilateral hand/wrist tingling pain

6   because of moderate degenerative changes of the cervical spine.  (AR 653.)

7          In September 2013, Plaintiff had x-rays of his shoulder and foot, which only showed minor

8   abnormalities.  (AR 661-663.)  That same month, Plaintiff had an examination of his spine and the

9   examining physician noted that Plaintiff was using a cane because of his left hip pain.  (AR 832.)

10  That physician also noted that Plaintiff's back condition does not impact his ability to work.  (AR

11  840.)

12         Plaintiff had more x-rays in October 2013 of his wrist and hands, which showed soft tissue

13  swelling of the wrist.  (AR 659-660.)

14         Finally, in November 2013, Plaintiff had x-rays of his knees, wrists, hands, and spine.  (AR

15  653-657.)  These x-rays showed that he has slight narrowing of some of his discs, anterior

16  osteophytes, reversal of lordotic curvature of the cervical spine, small calcifications in his wrist,

17  asymmetric mild right medial femoral tibial osteoarthritis, right tibial spine spurring, bilateral

18  patellar enthesopathy, and trace bilateral joint effusions.  (*Id.*)

19  **B.    Medical Evaluations**

20         Plaintiff underwent two examinations at the direction of the SSA to determine whether his

21  impairments were disabling.  Below is a summary of these evaluations.

22      **1) *Examining Clinical Psychologist Dr. Ute Kollath***

23         Dr. Kollath performed a Mental Status Evaluation at the request of the Department of

24  Social Services in February 2012.  (AR 564-568.)  In addition to talking to Plaintiff, Dr. Kollath

25  reviewed form SSA-3368, records from the Doctors Hospital of Manteca, and interdisciplinary

26  progress notes.  (AR 564.)  Plaintiff told Dr. Kollath that he suffered from depression and auditory

27  hallucinations.  (*Id.*)  Dr. Kollath concluded that Plaintiff's ability to follow complex/detailed

28  instructions, his ability to withstand the stress of a routine workday, and the ability to interact with

others on a regular basis, were unimpaired. (AR 567.) The only thing that was mildly impaired was his ability to maintain adequate pace or persistence when performing complex tasks (though his ability to do so for simple repetitive tasks was unimpaired.) (*Id.*) Dr. Kollath rated Plaintiff's GAF score at 70. (*Id.*)

### 2) *Examining Physician Dr. Kemesha Delisser*

That same month, Dr. Delisser reviewed the evidence in Plaintiff's file and conducted a comprehensive orthopedic evaluation for Plaintiff's left hip pain. (AR 569.) Plaintiff was able to walk to the examination room without assistance and sit comfortably. (AR 570.) Dr. Delisser diagnosed Plaintiff with left hip avascular necrosis and found that the conditions would impose limitations for twelve months without surgery. (AR 571.) Dr. Delisser concluded that Plaintiff had no limitations on his sitting capacity, could frequently lift 25 pounds, and there were no limitations on his workplace environmental activities; however, he could only stand for two hours and could occasionally lift up to 50 pounds. (AR 571-572.) Plaintiff did not have an assistive device at that time. (AR 571.)

## II. PLAINTIFF'S ALJ HEARINGS

### A.    Plaintiff's Testimony

#### 1) November 13, 2013 Hearing

Plaintiff was treated at the VA clinic in Martinez. (AR 62.) Plaintiff also received medical treatment and mental health treatment at the parole outpatient clinic every other month. (*Id.*) At the time of the hearing, Plaintiff had gone over a month without using any street drugs. (AR 63.) The hearing was continued to allow Plaintiff's attorney to obtain Plaintiff's medical records from the parole outpatient clinic. (*Id.*)

#### 2) Plaintiff's July 9, 2014 Supplemental Hearing Testimony

Plaintiff did three years of active duty in the army with an honorable discharge, no disciplinary actions, and no mental health treatment. (AR 49.) Thereafter, Plaintiff worked for the post office for 13 years as a material handler. (AR 33.) In the late 1990s, Plaintiff spoke to someone in the post office's employee assistance program about his mental health problem, but did not mention that he heard voices. (AR 38, 50.) While working at the post office, Plaintiff

worked part-time for his brother-in-law's landscaping company. (AR 40, 53.) Plaintiff stopped working at the post-office in 2005 when he was incarcerated. (AR 33.) Plaintiff was incarcerated for 11 months then went on parole. (AR 34.) While on parole, Plaintiff held odd jobs but could not get a full-time job. (*Id.*) Plaintiff was arrested again in 2008 for strong-arm robbery and served 38 months. (AR 35.) After Plaintiff was released, he could not work because of the arthritis in his hip and because of his mental condition at the time. (AR 35-36.) Plaintiff's arthritis had spread to his back, wrists, and shoulders. (AR 36.) Plaintiff could not have his hip replaced until he lost weight, which he indicated had been difficult because he could not exercise. (*Id.*)

Plaintiff started using drugs in 2001. (AR 39.) At the time of the hearing, Plaintiff had not used drugs in four months and had not had alcohol in six months. (AR 37-38.) Plaintiff was studying welding, but was having trouble doing so because of his body, so he changed his major to drug and alcohol counseling. (AR 39.) Plaintiff indicated that he missed classes sometimes because of his limitations and paranoia. (*Id.*)

Plaintiff cannot presently work because of his physical and mental limitations. (AR 41.) He cannot sit for a long time without his hip and back hurting, and cannot walk for too long without his hip hurting. (*Id.*) Plaintiff had been taking classes at the VA hospital for his mental health. (AR 41-42.) He also took classes at the parole office to learn how to use a computer and get help with his school work. (AR 42.) Plaintiff uses public transportation, but riding the bus hurts his hip and back and makes him paranoid when it is crowded. (AR 46.)

Plaintiff took Oxycontin and received a cortisone shot in his shoulder, but indicated that it did not help his pain. (*Id.*) Plaintiff was prescribed Geodon for his mental health issues, but he still hears voices several times a week or when he is around a lot of people. (AR 43.) Plaintiff has been hearing voices since the late 1970s. (AR 49.) The voices tell Plaintiff that he is worthless, but they no longer tell him to hurt himself or others. (AR 44.) Plaintiff also experiences paranoia and flashbacks. (AR 45.) Plaintiff has a hard time sleeping because of bad dreams and the voices he heard. (AR 46.) Consequently, Plaintiff would fall asleep in class or on the bus. (AR 48.)

**B.** <u>**Vocational Expert's Testimony**</u>

The ALJ presented Vocational Expert ("VE") JoAnn Yoshioka with a hypothetical of an individual of Plaintiff's age, education, work experience, and physical and mental capacity. (AR 54-55.) The individual can perform sedentary work for standing and walking and sitting, limited to two hours a day standing and walking and up to six hours a day sitting. (*Id.*) The VE testified that such an individual could perform the job of a patcher of electrical equipment (DOT code 723.687-010, SVP 2, of which there are 18,000 positions in California and 218,000 throughout the United States), a weight tester (DOT code 539.485-010, SVP 2, of which there are 47,000 positions in California and 454,000 throughout the United States), or a telephone quotation clerk (DOT code 237.367-046, SVP 2, of which there are 100,000 positions in California and 966,000 throughout the United States). (AR 55-56.) The ALJ eliminated the telephone quotation clerk position because it involves public interaction. (AR 56.)

The ALJ then asked a second hypothetical regarding a person who is limited to simple occasional public contact and with a change of position, from sitting to standing and vice versa, five minutes every hour. (*Id.*) The VE testified that it would not eliminate the first two positions. (AR 57.)

Plaintiff's attorney asked the VE if either of the first two jobs would be in an office setting or whether they would require occasional travel. (*Id.*) The VE testified that they would be in a factory or warehouse setting and would not require travel. (*Id.*)

**III. THE ALJ'S FINDINGS**

In an August 5, 2014 written decision, the ALJ found Plaintiff not disabled under Sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act, taking into consideration the testimony and evidence, and using the SSA's five-step sequential evaluation process for determining disability. (AR 11-23.)

At the first step, the ALJ concluded that Plaintiff has not engaged in substantial gainful activity since June 1, 2008. (AR 13.) The ALJ found that Plaintiff may have had temporary jobs, but there is insufficient evidence that any activities after the alleged disability onset date rose to the level of substantial gainful activity. (*Id.*)

At the second step, the ALJ concluded that Plaintiff possessed the following severe impairments: mild degenerative disc disease of the lumbar spine; bilateral osteoarthritis of the hips; degenerative joint disease of the right foot; obesity; a depressive disorder; an antisocial personality disorder; substance-induced psychosis; and polysubstance abuse (active). (*Id.*) The medical records indicate that the above impairments are severe and have more than a minimal effect on Plaintiff's ability to work. (AR 14.) However, other impairments such as knee and shoulder pain and schizoaffective disorder are nonsevere impairments. (*Id.*)

At the third step, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 416.926). (AR 15.) The ALJ considered the listings of 1.02 – major dysfunction of a joint, 104 – disorder of the spine, 12.02 – organic mental disorder, and 12.04 – affective disorder, 12.09 – substance addiction disorders. (AR 16.) The ALJ found insufficient evidence to satisfy the requisite criteria enumerated under the listings. (AR 15.) Because Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied. (*Id.*) The evidence also does not satisfy the "paragraph C" criteria. (AR 16.)

At the fourth step, the ALJ concluded that Plaintiff has the residual functional capacity to perform sedentary work within specific parameters: Plaintiff "can lift 10 pounds frequently and 20 pounds occasionally, perform no climbing of ladders, ropes or scaffolds, perform all other postural activities occasionally, requires a change of position (sit/stand) for 5 minutes every hour, and cannot have contact with the public." (*Id.*) The ALJ found that no treating physician or mental health practitioner opined that Plaintiff is unable to perform any work. (AR 20.) As to the opinion evidence, the ALJ assigned "great weight" to the GAF scores assigned to Plaintiff by various mental health practitioners, which "indicated transient or mild symptoms only." (*Id.*) The ALJ placed "great weight" on Dr. Kollath's conclusions because they are uncontroverted. (*Id.*) The ALJ also placed "limited weight" on Dr. Delisser's conclusions to the extent that they match

the residual functional capacity assessment. (*Id.*) The ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his alleged symptoms were not entirely credible. (AR 21.)

At the fifth step, the ALJ found that there was other work in the national economy that Plaintiff could perform, such as the job of patcher, of which there exists 18,000 jobs in California, and the job of weight tester, of which there exists 47,000 jobs in California. (AR 22.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id.*)

**IV. APPEALS COUNCIL**

Plaintiff filed a request for review on October 3, 2014, arguing that the ALJ's decision was not supported by accurate evidence. (AR 7.) The Appeals Council denied Plaintiff's appeal on April 13, 2016, concluding there was no reason to grant review on the basis of abuse of discretion, or any other reason. (AR 1.) The Appeals Council's decision rendered the ALJ's opinion final.

<strong>STANDARD OF REVIEW</strong>

Pursuant to 42 U.S.C. § 405(g), the Court has authority to review an ALJ's decision to deny benefits. When exercising this authority, however, the "Social Security Administration's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it is "more than a mere scintilla, but may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012) (internal citations and quotation marks omitted). To determine whether the ALJ's decision is supported by substantial evidence, the reviewing court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted).

Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are roles reserved for the ALJ. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533

F.3d 1035, 1038 (9th Cir. 2008) (internal citations and quotation marks omitted); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion.")  "The court may not engage in second-guessing." *Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's determination as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to resolve conflicts in the evidence." *Bertrand v. Astrue*, No. 08-00147, 2009 WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).  Similarly, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  However, the Court can only affirm the ALJ's findings based on reasoning that the ALJ herself asserted.  *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  In other words, the Court's consideration is limited to "the grounds articulated by the agency[.]"  *Cequerra v. Sec'y*, 933 F.2d 735, 738 (9th Cir. 1991).

### DISCUSSION

Plaintiff contends that the ALJ erred as a matter of law by (1) improperly weighing the medical opinion evidence; (2) incorrectly evaluating Plaintiff's credibility; (3) not fully developing the record; (4) drawing an improper conclusion at the step two finding; and (5) finding Plaintiff capable of performing work.  Plaintiff urges the Court to grant summary judgment and remand for payment of benefits, or in the alternative, further proceedings.

## I. THE ALJ'S CONSIDERATION OF MEDICAL OPINION EVIDENCE

### A.  **Legal Standard**

In the Ninth Circuit, courts must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as amended (Apr. 9, 1996)).  "A treating physician's opinion is entitled to more weight than that of an examining physician, and an examining physician's opinion is entitled to more weight than that of a nonexamining physician." *Orn*, 495 F.3d at 631.  If a treating doctor's opinion is not

12

contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). And "even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Lester*, 81 F.3d at 830 (internal citations and quotations omitted). Likewise, "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31.

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (internal citation omitted). Ultimately, "the ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988).

> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion.

*Garrison v. Colvin*, 759 F.3d 995, 1012-1013 (9th Cir. 2014) (internal citation omitted). In conducting its review, the ALJ "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Hill*, 698 F.3d at 1159 (internal citations omitted).

**B.** **Analysis**

Plaintiff insists that the ALJ erred in weighing the medical evidence when formulating Plaintiff's residual functional capacity ("RFC"). In particular, Plaintiff argues that the ALJ (1) failed to consider medical evidence suggesting that he uses a cane for ambulation, and (2) failed to include any cognitive limitations despite findings by examining physicians that he should be

limited to simple repetitive tasks and that he was moderately limited in pace and concentration. The Commissioner maintains that any such errors were harmless because while the RFC does not explicitly include these limitations, they are inherent in his findings.

**1) Plaintiff's Use of a Cane for Ambulation**

A claimant's RFC is "the most [he] can still do" despite the impairments and related symptoms that "may cause physical and mental limitations that affect what [he] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). The court must defer to the ALJ's RFC determination "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). The ALJ must consider all the medical opinions "together with the rest of the relevant evidence [on record]." 20 C.F.R. § 404.1527(b); *see also* § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

The ALJ's decision does not refer to Plaintiff's use of a cane even though the administrative record shows he used one. In July 2011, Plaintiff's treating physician, Dr. Pfile, prescribed Plaintiff a cane and mobility vest because of his left hip pain. (AR 439, 479.) Dr. Pfile wrote in her assessment of Plaintiff: "continue cane and mobility impaired vest" and Plaintiff was noted in all subsequent medical visits except one to use a cane for ambulation.[4] (AR 439, 469, 479, 557, 634, 827, 832.) The medical visit during which Plaintiff was not using a cane was Dr. Delisser's examination in 2012, in which she noted that Plaintiff was not using a cane for ambulation or any other assistive device. (AR 571.) However, throughout 2012 and 2013, other physicians noted that Plaintiff was still using a cane. (AR 557, 634, 827, 832.)

Because the ALJ did not discuss Plaintiff's use of a cane, the Court cannot discern whether the ALJ found it was not necessary or simply did not consider it. As the Court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely," *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007), the Court

---

[4] "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996).

cannot conclude that substantial evidence supports the ALJ's failure to include Plaintiff's cane use in the RFC determination.

The Commissioner's insistence that the ALJ's failure to consider the cane is harmless error is unpersuasive. Use of a "medically required hand-held assistive device" may "significantly erode" the occupational base for an individual who must use such a device. Social Security Ruling (SSR) 96-9p at *7; *Cano v. Colvin*, No. 14-4397, 2015 WL 10945616, at *4 (C.D. Cal. Jan. 26, 2015).[5] Thus, "[i]f a claimant has a genuine medical need for a cane, such a limitation should be included in any hypothetical questioning of the VE." *Blanket v. Berryhill,* No. 2:16-00001-LRS, 2017 WL 2234184, at *4 (E.D. Wash. May 22, 2017); *see also Flores v. Shalala*, 49 F.3d 562, 570 (9th Cir. 1995) ("A hypothetical question posed to a vocational expert must include all of the claimant's functional limitations, both physical and mental."). "The vocational effect of a cane restriction may vary as to each function an individual can perform. It may limit standing, walking, lifting, carrying, pushing or pulling*." Blanket*, 2017 WL 2234184 at *4.

In *Blanket*, for example, the plaintiff was prescribed a cane, which the ALJ considered in the RFC assessment. However, at the ALJ hearing, the ALJ did not ask the VE to consider the plaintiff's use of a cane; rather, "the ALJ considered that limitation to be inherent in the sit/stand option she included as a limitation in the hypothetical questions she asked the VE." 2017 WL 2234184, at *3. The court disagreed and held that because a cane can be restrictive in certain vocational functions, on remand the ALJ had to determine when the plaintiff's use of a cane is necessary. *Id*. at *4. The court instructed that this finding must then be presented to the VE so the ALJ could accurately conclude if there were other jobs available that the plaintiff is capable of performing. *Id*.

Similarly, here, if Plaintiff's use of a cane is medically required, the cane could affect Plaintiff's ability to perform certain jobs, including those identified by the VE. The inclusion of a

---

[5] The sedentary occupational base is not significantly eroded if the hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base, but it may be significantly eroded if the individual needs the device for balance because of significant involvement of both lower extremities. SSR 96-9p at *7.

United States District Court
Northern District of California

sit/stand option in the ALJ's hypothetical to the VE did not sufficiently address this issue because, as the regulations and caselaw recognize, the need for a cane may limit the available jobs notwithstanding a sit/stand option. *See Blanket*, 2017 WL 2234184 at *4 (reviewing cases).

**2) Plaintiff's Cognitive Limitations**

Plaintiff also argues that the ALJ erred in failing to incorporate into the RFC or the hypothetical questions to the VE his moderate limitations in certain functional areas and his ability to perform simple routine repetitive tasks for two-hour intervals. In support of this argument Plaintiff relies on a review of his records from state psychiatrist Dr. Gregg. (Dkt. No. 13 at 15.) Dr. Gregg found that Plaintiff's concentration and persistence were moderately limited in certain areas. (AR 128.) Dr. Gregg concluded that Plaintiff can understand simple instructions, can carry out simple routine repetitive tasks for two-hour periods, can accept supervision and can interact with coworkers. (AR 129.) The ALJ's opinion does not reference Dr. Gregg's findings and instead focuses on the findings of state agency examining physician Dr. Kollath who concluded that Plaintiff's ability to follow complex/detailed instructions, his ability to withstand the stress of a routine workday, and the ability to interact with others on a regular basis, were unimpaired. (AR 567.) Dr. Kollath found only that Plaintiff's ability to maintain adequate pace or persistence when performing complex tasks was mildly impaired (though his ability to do so for simple repetitive tasks was unimpaired.) (*Id.*)

As with Plaintiff's use of a cane, the ALJ did not explicitly discount Dr. Gregg's findings regarding Plaintiff's cognitive limitations—he simply failed to discuss them. However, the ALJ's failure to consider Dr. Gregg's assessment is harmless because the jobs the ALJ considered at step five were all unskilled and thus included only simple tasks. *See McGarrah v. Colvin*, 650 F. App'x 480, 481 (9th Cir. 2016) ("Unskilled work is defined as work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.") (internal citations omitted). Thus, Dr. Gregg's finding that Plaintiff can perform simple tasks for two-hour periods does not contradict the ALJ's findings. In fact, Dr. Gregg and Dr. Jessee, a physician who conducted a Mental Residual Functional Capacity Assessment in 2011, both found that Plaintiff

1   retains the ability to perform simple, repetitive, routine tasks for two-hour periods, understand

2   simple instructions, and interact with coworkers and supervisors.  (AR 77-78, 110-111.)

3           Dr. Gregg and Dr. Jessee also found that Plaintiff has sustained concentration and

4   persistence limitations and is moderately limited in completing a normal workday and performing

5   at a consistent pace.  (*Id.*)  However, the ALJ did not need to specifically mention these

6   limitations; instead, the ALJ's assessment of Plaintiff has to be consistent with the restrictions

7   found in these and other medical testimonies.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169,

8   1174 (9th Cir. 2008) (holding that an ALJ's assessment does not need to specifically mention

9   restrictions related to concentration, persistence, or pace "where the assessment is consistent with

10  restrictions identified in the medical testimony.").

11          In *Stubbs-Danielson*, for example, the court held that the ALJ's RFC finding that the

12  claimant "'retains the residual functional capacity to perform simple, routine, repetitive sedentary

13  work, requiring no interaction with the public,'" was sufficient to capture the claimant's

14  concentration, persistence, and pace limitations.  Here, the Court finds that Dr. Gregg and Dr.

15  Jessee's findings were included in and consistent with the limitations the ALJ posed to the VE,

16  which narrowed available jobs to unskilled, sedentary work.  (AR 54-55.)  Further, nothing in the

17  record shows that the ALJ discounted Dr. Gregg's opinion; rather, the ALJ noted that he

18  considered all the opinion evidence.  (AR 20.)

19  **II. THE ALJ'S CREDIBILITY FINDING**

20  **A.      Standard for Assessing Credibility**

21          Plaintiff asserts that the ALJ erred by discrediting his testimony.  If the claimant has

22  presented objective medical evidence of an underlying impairment which could reasonably be

23  expected to produce the pain or other symptoms alleged, and there is no evidence of malingering,

24  the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives

25  "specific, clear and convincing reasons" for the rejection.  *See Vasquez v. Astrue*, 572 F.3d 586,

26  591 (9th Cir. 2009).  An ALJ's findings concerning credibility must be "grounded in evidence"

27  and articulated with "sufficient[ ] specific[ity] [so as] to make clear to the individual and to any

28  subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons

for that weight." SSR 96–7p, 1996 WL 374186 (July 2, 1996). In making such a determination, the ALJ may consider at least the following: claimant's reputation for truthfulness, inconsistencies in claimant's testimony, claimant's daily activities, work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). The ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). Further, when evaluating credibility, an ALJ may consider "the claimant's daily activities" and work history. *See* 20 C.F.R. §§ 404.1529(c)(3)(i),416.929(c)(3)(i); ; *Fair*, 885 F.2d at 603 (stating that the claimant's daily activities may be evidence upon which an "ALJ can rely to find a pain allegation incredible."); *see also Thomas*, 278 F.3d at 959 (holding that claimant's poor work history "negatively affected her credibility regarding her inability to work.").

**B.  <u>Analysis</u>**

The ALJ concluded that Plaintiff's testimony regarding the severity and functional consequences of his disability was not fully credible because: (1) Plaintiff stopped working for the post office because of a parole violation, not because of his "allegedly disabling pain and other symptoms"; (2) Plaintiff has been able to work and take college classes since his alleged disability onset date; (3) Plaintiff's statements to various treatment providers regarding his symptom and treatment compliance undermine his allegations of disabling pain; and (4) Plaintiff made inconsistent statements regarding his drug and alcohol use. (AR 20-21.)

First, an ALJ may consider the fact that Plaintiff left work for non-medical reasons. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001), as amended (Nov. 9, 2001). Here, the ALJ considered the fact that Plaintiff initially stopped work at the post office because he was incarcerated, not because he was too disabled to work. The ALJ likewise attributed his ongoing unemployment to his criminal history and parole violations as opposed to the allegations of disability. Indeed, the record shows that Plaintiff has been in and out of custody since his alleged disability onset date. (AR 423-459, 595). An ALJ may properly consider a claimant's "spotty"

work history before and after the alleged disability onset date in evaluating credibility. *See Thomas*, 278 F.3d at 959.

Second, the ALJ properly considered Plaintiff's ability to work and take college classes in determining whether Plaintiff's subjective allegations of pain supported an inability to work. "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014). Here, Plaintiff is able to take public transportation and interact sufficiently with his professors and other students to continue his educational pursuits, which supports the ALJ's finding that Plaintiff is able to work. *See e.g., Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (recognizing that although claimant's daily activities did not suggest that he could return to prior work, they did suggest that the alleged severity of limitations were exaggerated); *Jin Liu v. Berryhill*, No. 16-01553, 2017 WL 1739105, at *3 (N.D. Cal. May 4, 2017) (concluding that the ALJ had not erred in finding Plaintiff was not fully credible based in part on the fact that "Plaintiff attended school during the period during which he alleges he was completely disabled, and engaged in daily activities that are inconsistent with his claims of total disability"); *Chappelle v. Berryhill*, No. 6:16-CV-00444-SB, 2017 WL 2399581, at *8 (D. Or. June 2, 2017) (concluding that it was reasonable "for the ALJ to find that [plaintiff's] reported activities, which included earning an associate's degree during the alleged period of disability, caring for his nine-year-old daughter, walking up to a mile per day, hiking, assisting with household chores, participating in "various after school activities," and applying for jobs and reportedly being willing to accept a job offer post-alleged onset date, were incompatible with his reported limitations.").

Third, the ALJ properly considered the inconsistencies in Plaintiff's statements about his symptom and treatment compliance and Plaintiff's allegations of disabling pain. Plaintiff asserts that he was not taking medication despite his alleged pain because "doctors were unsure if they could prescribe him narcotic medication given his status as a parolee." (Dkt. No. 13 at 16.) This explanation is not true. Rather, in 2011, Dr. Pfile wrote that Plaintiff needed an increased dose of his pain medication and she would take it up with the pain management committee. (AR 479-

480.)  Then in 2012, Plaintiff's psychiatrist and social worker both noted that Plaintiff was not on any pain medication, but had an upcoming appointment regarding his hip.  (AR 909.)  The ALJ is not contesting that Plaintiff ever took pain medications, rather, that when Plaintiff said he was in pain, he was not always taking pain medication.  *See* SSR 96-7p (finding that an "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints").

Finally, the ALJ's reliance on inconsistencies in Plaintiff's statements regarding his drug and alcohol use is problematic.  The ALJ misstated the record: Plaintiff's statement on April 9, 2014 that he was clean and sober that day although he had relapsed two weeks prior is not inconsistent with his subsequent statement, on June 16, 2014—over 90 days from March 26—that he had been clean for 90 days.  (AR 894, 897.)  However, any such error is harmless in light of the cumulative evidence supporting the ALJ's adverse credibility finding.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (stating that an ALJ's citation to erroneous reasons is harmless so long as the "ALJ's remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record[ ]").

On balance, Plaintiff's work history and the other reasons which may have contributed to his inability to hold down a job, his ability to attend school, and his inconsistent reports regarding his pain and use of medication constitute substantial evidence supporting the ALJ's adverse credibility finding.

## III. WHETHER THE ALJ SHOULD HAVE DEVELOPED THE RECORD FURTHER

### A.    Legal Standard

Plaintiff argues that the ALJ did not fulfill his duty to develop the record because he failed to obtain a current orthopedic examination or medical expert testimony.

Only if evidence in the record is inadequate or ambiguous to allow proper evaluation of an impairment, does "[t]he ALJ ... [have] an independent duty to fully and fairly develop the record . . . ." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001) (holding that the ALJ failed to develop the record when he relied heavily on the opinion of a non-examining medical expert to find that the claimant suffered from a mild mental impairment, but ignored the same expert's

20

opinion that conflicting treating physicians reports rendered the record ambiguous as to the possibility of more serious mental impairments such as chronic schizophrenia or depressive disorder); *see also Armstrong v. Comm'r of Soc. Sec. Admin*., 160 F.3d 587, 590 (9th Cir. 1998) (holding that where the record is ambiguous the ALJ must "assist the claimant in creating a complete record"). The ALJ can discharge this duty in several ways, including by: (1) making a reasonable attempt to obtain medical evidence from the claimant's physician(s); (2) ordering a consultative examination when the medical evidence is incomplete or unclear; (3) subpoenaing or submitting questions to the claimant's physicians; (4) continuing the hearing; or (5) keeping the record open for more supplementation. *See Tonapetyan*, 242 F.3d at 1150; 20 C.F.R. §§ 404.1512, 404.1517.

Here, there is no indication in the ALJ's written opinion or in the transcript that he denied Plaintiff benefits based on his belief that the record was inadequate or ambiguous. Plaintiff's record is replete with treatment notes, examination reports, and x-ray analyses. Plaintiff's arguments to the contrary are unavailing.

First, Plaintiff contends that "[a]t the hearing, the ALJ pointed out that there were no recent medical opinions regarding the limitations Mr. Hines experiences from his orthopedic complaints." (Dkt. No. 13 at 17.) Not so. At the hearing, the ALJ summarized the medical evidence, noted that there was an orthopedic CE and that "there was definitely evidence of orthopedic impairments." (AR 51.) Thus, there is nothing to suggest that the ALJ found the medical evidence with respect to Plaintiff's orthopedic limitations insufficient.

Second, Plaintiff seems to suggest that the duty to develop the record arose because Dr. Delisser's report did not mention Plaintiff's use of a cane and thus Dr. Delisser's report is less credible. However, there is no reason to believe that Dr. Delisser's failure to mention Plaintiff's use of a cane was a negligent omission on Dr. Delisser's part as opposed to the fact that Plaintiff was not in fact using a cane during his exam with Dr. Delisser. (AR 571.) (Dr. Delisser wrote: "there are no assistive devices"). Even if this were not the case, the ALJ gave *less* weight to the opinion of Dr. Delisser because he found Dr. Delisser's limitations inconsistent with the ALJ's more restrictive assessment of Plaintiff's RFC. (AR 20.) In formulating this more restrictive

RFC, the ALJ relied on the objective medical evidence regarding Plaintiff's orthopedic conditions, including numerous x-rays. (AR 16-17, 652-669.) In any event, as discussed above, the matter is being remanded so that the ALJ can make a finding as to whether the use of a cane is medically necessary.

Third, Plaintiff maintains that the ALJ erred in finding that his shoulder condition was not severe because he relies on Dr. Delisser's out-dated and internally inconsistent report which was inconsistent with the medical evidence. In fact, the ALJ relied upon a 2013 x-ray of Plaintiff's shoulder (a year after Dr. Delisser's exam) which noted that "with the exception of slightly decreased range of motion, findings were normal and the examiner opined that there were not functional or work limitations." (AR 17 (citing Exhibits 18F/195-202 (AR 840-848)).) Thus, there is nothing to suggest that the ALJ found the medical evidence regarding Plaintiff's shoulder condition inadequate or ambiguous.

Finally, Plaintiff highlights that the ALJ mischaracterized his condition as osteoarthritis, although he was actually diagnosed with severe avascular necrosis with total collapse of his hip point. Plaintiff maintains that a medical expert could have "helped the ALJ distinguish the differences between the functional limitations of those two separate conditions." (Dkt. No. 13 at 17-18.) However, Plaintiff's statement is incorrect. The ALJ accurately recited that "x-rays of the claimant's pelvis . . . confirmed severe left hip osteoarthritis with bone on bone contact and moderate right him osteoarthritis." (AR 16.) This finding is confirmed by the record, including a radiology report that states "severe left and moderate right hip osteoarthritis." (AR 589.) Plaintiff on the other hand cites to a medical report which only concluded that "the possibility of a developing avascular necrosis should be considered." (AR 476.) Thus, the ALJ did not mischaracterize Plaintiff's condition as osteoarthritis.

Plaintiff bears the burden of proving that he suffers from "any impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1520(c), 416.920(c)). Unlike in *Tonapetyan*, where the ALJ's duty to develop the record was triggered by an expert's uncertainty regarding conflicting diagnoses of mental disorders, here there is an

22

absence of evidence suggesting that Plaintiff's orthopedic impairments were more severe than noted by the ALJ. *See Tonapetyan*, 242 F.3d at 1149–1151.  There is nothing to suggest that the ALJ viewed the record as inadequate or insufficient to allow him to formulate Plaintiff's RFC and as such he was under no duty to develop the record.  *See McLeod v. Astrue*, 640 F.3d 881, 884-85 (9th Cir. 2011) (holding that the ALJ did not have a duty to request additional information from two of plaintiff's treating physicians about the kind of work he could perform, because "substantially all of their medical records throughout the time they treated [him] were before the ALJ" and there "was nothing unclear or ambiguous about what they said").

## IV. REMAND IS WARRANTED

When "'the record before the agency does not support the agency action, . . . the agency has not considered all relevant factors, or . . . the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'"  *Treichler v. Comm. of Social Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).  While the Court affirms much of the ALJ's decision, in light of the ALJ's failure to consider Plaintiff's use of a cane, remand is warranted.

### CONCLUSION

For the reasons described above, the Court GRANTS Plaintiff's Motion for Summary Judgment in part (Dkt. No. 13) and DENIES Defendant's Cross-Motion for Summary Judgment (Dkt. No. 18) and remands the matter to the Agency for further proceedings consistent with this Order.

This Order disposes of Docket Nos. 13 and 18.

IT IS SO ORDERED.

Dated: July 31, 2017

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge